# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **AMERICAN POWER TOWER LLC,** <br> 538 Goodale Road <br> Jefferson, Ohio 44047, <br><br> **Plaintiff,** <br><br> v. <br><br> **KEE INDUSTRIES INC.,** <br> c/o its Registered Agent, <br> Registered Agents Inc. <br> 5900 Balcones Drive <br> Suite 100 <br> Austin, Texas 78731, <br><br> **KEE CONSTRUCTION SERVICES & CONSULTING LLC** <br> c/o its Registered Agent, <br> David J. Koelzer <br> 4710 Plum Drive <br> Dickinson, Texas 77539 <br><br> **KEE ENERGY, LLC** <br> 2200 Dickinson Avenue <br> Dickinson, Texas 77539 <br><br> **Defendants.** | CASE NO. _____ <br><br> JUDGE _____ <br><br><br> **COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT** <br><br> **(JURY DEMAND ENDORSED HEREON)** |

Plaintiff, American Power Tower LLC ("APT" or "Plaintiff"), by and through its undersigned counsel, for its Complaint against Defendants, Kee Industries Inc., Kee Construction Services & Consulting LLC, and Kee Energy, LLC (collectively "KEE" or "Defendants"), for breach of contract, tortious interference with business relationship(s), and a declaratory judgment action, states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff is and was at all times relevant to this action an Ohio limited liability company, with its principal place of business in Ohio. Plaintiff conducts business throughout the United States and in the State of Ohio.

2.      On information and belief, Kee Industries Inc., is and was at all times relevant to this action a Texas for-profit corporation, with its principal place of business in Texas. Kee Industries Inc., conducts business throughout the United States and in the state of Ohio.

3.      On information and belief, Kee Construction Services & Consulting LLC is and was at all times relevant to this action a Texas limited liability company, with its principal place of business in Texas. Kee Construction Services & Consulting LLC conducts business throughout the United States and in the state of Ohio.

4.      On information and belief, Kee Energy, LLC is and was at all times relevant to this action a Texas limited liability company, with its principal place of business in Texas. Kee Energy, LLC conducts business throughout the United States and in the state of Ohio.

5.      On information and belief, Kee Construction Services & Consulting LLC and Kee Energy, LLC are affiliates of Kee Industries Inc., and operate in conjunction with one another to perform services for companies, and here, for APT. Accordingly, Plaintiff will refer to Defendants as a group, "KEE."

6.      This Court has diversity subject matter jurisdiction over this dispute (under 28 U.S.C. § 1331) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

7. This Court has personal jurisdiction over KEE because KEE regularly transacts business in the State of Ohio, has systematic and continuous contacts with the State of Ohio, and the conduct, injuries, and damages that gave rise to Plaintiff's claims herein occurred in Ohio.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b) because the Complaint arises out of agreements, commitments, and communications made or received in Ashtabula County, Ohio and conduct that occurred in and/or caused damage to Plaintiff in Ashtabula County, Ohio.

## FACTUAL BACKGROUND

### APT's Business and Relationship with Clients

9. APT is a telecommunications infrastructure development business that installs satellite antennas and cell towers for mobile wireless service companies.

10. To facilitate its business, APT works with clients, who, in turn, must engage and work with landowners who offer their property for lease, in exchange for compensation, to be developed by the mobile wireless service companies for the installation and usage of satellite antennas and cell towers.

11. As part of its business relationships with clients, for example, APT enters into master services agreements, which govern the contracting relationship between the parties. This case involves a master services agreement with Crown Castle USA Inc., ("Crown Castle").

12. As part of a master services agreement, APT, the contractor on the project, agreed to indemnify, defend, and hold harmless, its client – in this case Crown Castle – and any of the client's affiliates, landowners leasing property to Crown Castle, etc., from and against any and all suits, actions, proceedings, claims, costs, and expenses arising out of any failure of the

contractor or its affiliates to perform its obligations under the contract/agreement or a breach by a contractor or its affiliates.

13. As such, APT is contractually required to step into the place of the client, *i.e.*, Crown Castle, in the event of any claim or action against the client or its customers/landowners.

14. Similarly, APT and its lower tier contractors (including KEE) are contractually barred from bringing any claim for damages, including mechanics' liens, against the customer, any of the customer's affiliates, or any landowner for or on account of any labor, materials, equipment, work done, or performance given under, arising out of, or in any way connected with the work done on the properties under the contracts.

## The Parties' Relationship

15. Having proven itself to be a reliable contractor, APT had been presented with several prospects, specifically contracts with major wireless network companies like Samsung, DISH, etc., to expand its business endeavors in the fall of 2022.

16. To capitalize on new business ventures, APT intended to hire and add personnel to its management, technical, and subcontractor departments.

17. In the alternative, APT considered being acquired by a larger entity with adequate personnel and resources to support its new business ventures.

18. KEE claims to be a construction and construction management company that provides services for on-site safety management and monitoring at construction sites; construction equipment; additional specialty services including but not limited to welders, pipefitters, millwrights, and machinists; professional engineering; and renewable energy services, including but not limited to solar construction, start-up, and testing.

19. On or around September 20, 2022, KEE contacted APT to express interest in expanding into the telecommunications infrastructure development business and in acquiring APT.

20. KEE represented that it would take charge of the project that APT obtained from Samsung. Specifically, KEE indicated that it would negotiate, plan, direct, staff, and supervise all work performed on this project.

21. APT and KEE entered into a Confidentiality Agreement to facilitate KEE's potential acquisition of APT on or around September 26, 2022.

22. On or around October 11, 2022, APT and KEE personnel conferred to discuss assignment of projects on APT's Samsung contract.

23. On or around November 17, 2022, APT prepared a draft of a joint venture memorandum memorializing KEE's agreement to provide services at APT's direction in exchange for payment for those services.

24. KEE was tasked with developing a final memorandum of understanding to cover the provision of services to APT and a separate acquisition offer and necessary contracts. KEE, however, never produced these documents for APT's review and execution.

### The Parties' Agreement

25. Considering KEE's experience, size, and available resources, while awaiting finalization of a written agreement, APT entered into an oral agreement with KEE for KEE to provide services and approved personnel to assist APT with DISH installation projects in Ohio, Pennsylvania, and West Virginia, with an eye toward entering into a memorandum of understanding with KEE to purchase and acquire APT and to work on projects as mutually determined.

26. All of the management services provided by KEE were provided remotely, from Texas.

27. By late December 2022, however, KEE had proved unable to assist APT adequately with its installation projects. Specifically, KEE failed to provide qualified field personnel in a timely manner.

28. For example, KEE field personnel were only deployed to two sites. At one site, KEE's workers arrived too late to perform any work at that location. After APT reassigned KEE to the second work site, KEE personnel were tardy yet again. When presented with the opportunity to assist APT with the work, KEE's crew stood idly by watching APT's staff work.

29. In addition, KEE failed to provide any management support (accounting assistance, logistical planning, bid proposals, work plans, employee orientation, employee training, etc.) to APT.

30. Nevertheless, KEE issued its first invoice to APT on December 22, 2022.

31. As part of the oral understanding between APT and KEE, APT agreed to pay KEE for approved services and personnel costs. APT never agreed to pay a mark up of any costs or pay for generic administrative services or expenses as identified in the first and subsequent invoices. APT promptly reminded KEE of its position on the parties' agreement.

32. At no point did APT agree to pay KEE's due diligence expenses. Even so, KEE continued to include such charges on its invoices to APT.

33. From December 2022 through March 2023, KEE maintained its interest in acquiring APT's business. As part of KEE's due diligence analysis for that potential transaction, Dave Koelzer, President of KEE, several other owners, and several project managers incurred

time and expenses in conducting KEE's investigation into APT's business, including travel from Texas to APT's offices in Jefferson, Ohio.

34. APT consistently objected to these charges, and on several occasions, KEE acknowledged that the charges were inappropriate.

35. KEE indicated, however, that these executive expenses would not matter because KEE would soon be acquiring APT, making these expenses a purely internal matter for KEE.

36. Eventually, APT notified KEE that it was terminating its relationship with KEE regarding KEE's promise to assist APT with its service contracts and regarding KEE's promise to submit an acquisition offer.

37. KEE sought to collect $395,601.90 on its various outstanding invoices to APT.

38. APT disputed this total and, after recalculating the amount billed by removing administration costs and executive expenses, APT, in the spirit of cooperation, noted that the maximum amount of money that KEE could reasonably charge was $235,763.01.

39. To date, APT has paid $170,000.00 of that amount to KEE and agreed to make a final payment of $65,763.01 to KEE for the services KEE provided.

40. KEE rejected APT's final payment offer and insisted that APT pay it the entire outstanding amount, including due diligence expenses. KEE threatened to file mechanics' liens on all of APT's clients/customers' properties – over twenty-six properties altogether – should APT fail to pay the outstanding invoices in full by the end of that week.

41. Later on, APT reviewed and recalculated KEE's costs and expenses actually related to on-site work and found that, during the times KEE was present at the work sites, KEE did not add any value to the projects. Nevertheless, APT extended a modified offer of $12,000.00, as final payment to KEE to avoid a dispute.

42. All of the amounts invoiced by KEE were for projects located in Ohio, Pennsylvania, and West Virginia. APT had already paid for all work KEE completed, with the exception of two project sites located in Pennsylvania for which APT twice offered to pay $12,000.00 to compensate KEE.

43. Although APT had paid KEE for management services performed remotely and (with two exceptions) KEE had not provided any in-person service at the job sites, on or around May 9, 2023, KEE issued "Notices of Intention to File Mechanics' Liens" to approximately twenty-six landowners in Ohio, Pennsylvania, and West Virginia, where APT performed work.

44. On information and belief, to date, KEE has not filed mechanics' liens on any of these properties.

45. The threat of making such filings, however, including but not limited to, the Notices of Intention to File Mechanics' Liens, has interfered with APT's contractual and business relationships and damaged its corporate reputation. Indeed, by sending notices to the landowners, KEE has caused APT to be unable to comply with its agreement with at least one customer.

46. By relying upon KEE's contentions that KEE could adequately assist APT in the growth of its business, APT lost profits and customer goodwill. Specifically, APT lost its contract with Samsung, which would have resulted in significant profit. In addition, APT missed out on the additional job prospects DISH had to offer, which also would have resulted in significant profit.

47. APT also directly suffered damages as a result of expending its limited management resources in attempting to assist KEE in its integration with APT's business operations in an estimated amount of $95,000.00.

48. APT's reputation within the industry has been damaged by KEE's threat of filing (brought to fruition by issuing "Notices of Intention to File Mechanic's Lien") mechanics' liens on APT's customers' property. APT's current and potential business customers have called APT's abilities into question, and APT has lost jobs including a large Samsung contract, which they would have received, as a result of KEE's actions.

## COUNT ONE
### Breach of Contract

49. APT incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

50. The parties established a contractual relationship based on their communications and course of conduct in which KEE was to provide services and approved personnel to assist APT with DISH and Samsung installation projects in Ohio, Pennsylvania, and West Virginia in exchange for reasonable compensation for those approved services and personnel costs.

51. APT complied with its obligations and all material terms of the parties' agreement by providing work to KEE and reasonably compensating KEE for the services it provided.

52. KEE has materially breached its agreement with APT by failing to adequately assist APT with its installation projects and by demanding payment for mark ups of costs and for generic administrative services and expenses.

53. As a direct and proximate result of KEE's breach of contract, APT has incurred and will continue to incur damages, the exact amount of which will be determined prior to or at trial.

## COUNT TWO
## Tortious Interference with Contracts and Business Relationships

54. APT incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

55. APT maintains ongoing contracts with clients, including but not limited to Crown Castle, in which APT performs satellite antennas and cell towers installation services for mobile wireless service companies on the clients' properties.

56. Under APT's agreement with Crown, for example, neither APT nor its lower tier contractors (including KEE) are precluded from bringing any claim for damages, including mechanics' liens, against the customer, any of the customer's affiliates, or any landowner for or on account of any labor, materials, equipment, work done or performance given under, arising out of, or in any way connected with the work done on the properties under the contracts. To that end, APT is required to submit a waiver of lien with its invoices.

57. By and through its Notices of Intention to file Mechanics' Liens and threats and warnings of legal action, KEE has intentionally interfered with the contractual relations of APT and Crown Castle and has caused APT to be unable to comply with its agreement(s) with Crown Castle and other customers.

58. As part of these contracts, APT is obligated to indemnify and defend the clients and their affiliates against any suits, proceedings, losses, damages, claims, etc. resulting from failure of any contractor to perform obligations under related contracts and/or breach by any contractor in relation to the work being performed on the properties.

59. Accordingly, as part of APT's indemnification obligation, APT asserts the rights of its customers/clients, *i.e.*, Crown Castle, and brings this tortious interference claim against KEE.

60. Upon information and belief, KEE is aware of APT's contractual agreements with its clients, including but not limited to Crown Castle.

61. KEE's intentional and tortious interference of APT's contractual relationships with Crown Castle lacks any justification, apart from the two Pennsylvania properties, for KEE has no standing to assert mechanics' liens against Crown Castle and was, in fact, contractually barred from asserting mechanics' liens against Crown Castle and other customers.

62. Due to KEE's intentional and tortious interference with APT's contractual relationships with Crown Castle, APT has suffered economic damages and incurred unnecessary legal expenses. APT has suffered, and will continue to incur in the future, economic damages as a direct and proximate result of KEE's tort.

## COUNT THREE
### Declaratory Judgment

63. APT incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

64. Pursuant to R.C. 2721.02, "courts of record may declare rights, status, and other legal relations whether or not further relief is or could be claimed…The declaration has the effect of a final judgment or decree."

65. There exists a controversy between KEE, APT, and APT's customers regarding whether APT owes KEE any monies under any contract and the validity of any mechanics' liens placed on properties where APT performed work.

66. KEE does not hold a valid and subsisting lien on the properties because KEE did not perform work on the properties, and thus does not have standing to obtain mechanics' liens on these properties. *See e.g.,* R.C. 1311.01, *et seq.*; 49 Pa.C.S. § 1101, *et seq.*; W. Va. Code § 38-2-1.

67. Therefore, APT is entitled to a declaration from this Court that the mechanics' lien filings on the properties are invalid as a matter of law and are deemed released from the title.

**WHEREFORE**, APT respectfully requests judgment as follows:

A. With respect to Count One, APT requests judgment against KEE for breach of contract in an amount exceeding $75,000.00, plus interest, costs, expenses, and attorney fees;

B. With respect to Count Two, APT requests judgment against KEE for tortious interference with its business relationships with its customers/clients in an amount exceeding $75,000.00, plus interest, costs, expenses, and attorney fees;

C. With respect to Count Three and pursuant to R.C. 2721.01 *et seq.*, APT requests that this Court issue a declaratory judgment asserting that the mechanics' liens filed on APT's clients/customers' properties are invalid as a matter of law and are deemed released from the title.

D. Any other legal and equitable relief as this Court deems just and appropriate.

Respectfully submitted,

*/s/ Jay R. Carson*
Jay R. Carson (0068526)
Angela M. Lavin (0069604)
Mary E. Dennison (0100059)
WEGMAN HESSLER VALORE
6055 Rockside Woods Boulevard, Suite 200
Cleveland, Ohio 44131
Telephone: (216) 642-3342
Facsimile: (216) 642-8826
E-Mail: jrcarson@wegmanlaw.com
    amlavin@wegmanlaw.com
    medennison@wegmanlaw.com

*Attorneys for Plaintiff*
*American Power Tower LLC*

## JURY DEMAND

Plaintiff hereby demands a trial by Jury on all issues so triable pursuant to FRCP 38(b).

/s/ *Jay R. Carson*
Jay R. Carson (0068526)
WEGMAN HESSLER VALORE

*One of the Attorneys for Plaintiff*
*American Power Tower LLC*